FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2018 JUL 27 PM 3: 12

CLERK'S OFFICE
AT BALTIMORE
BY_____A_____DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Northern Division

UNITED STATES OF AMERICA and
STATE OF MARYLAND,
*ex rel.* CHARLES MORRISON,

        Plaintiff-Relator,

            v.

LIFEBRIDGE HEALTH, INC.,
2401 W. Belvedere Ave.
Baltimore, MD 21215-5271,

SINAI HOSPITAL OF BALTIMORE, INC.,
2401 W. Belvedere Ave.
Baltimore, MD 21215-5271,

and JOHN DOE LIFEBRIDGE PHYSICIANS
1-173,

        Defendants.

Civil Action No.

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(a)(2)**

**JURY TRIAL DEMANDED**

**PWG 18 CV 2311**

## SEALED COMPLAINT

Relator Charles Morrison ("Relator"), by and through undersigned counsel, brings this

False Claims Act Complaint on behalf of the United States of America and the State of Maryland

against Defendants LifeBridge Health, Inc. ("LifeBridge Health"), Sinai Hospital of Baltimore,

Inc. ("Sinai Hospital"), and John Doe LifeBridge Physicians 1-173 (collectively, "the

Defendants"). This action is brought by Relator to recover civil penalties and treble damages

under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the Maryland False Health

Claims Act, Md. Code Ann. Health Gen. § 2-601 *et seq.* ("MFHCA").

## INTRODUCTION

1.    This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Maryland arising from false and/or fraudulent statements, records and claims made, or caused to be made, by the Defendants and/or their agents and employees.

2.    This qui tam case is brought against the Defendants for submitting and/or causing the submission of false claims by knowingly or recklessly disregarding the submission of miscoded reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq.*, Medicaid, 42 U.S.C. § 1396 *et seq.*, TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, and Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901, *et seq.* (herein collectively referred to as "Federal Healthcare Programs") and Maryland's Medical Assistance Program ("MMAP") and Children's Healthcare Program ("MCHIP") (herein collectively referred to as "Maryland Healthcare Programs") (the Federal Healthcare Programs and the Maryland Healthcare Programs are referred to herein collectively as the "Government Healthcare Programs") that Defendants knew or recklessly disregarded were flawed based on their failure to take reasonable steps to ensure that the hospital's and its physicians' claims for governmental reimbursement are accurate.

3.    For years, LifeBridge Health has intentionally bypassed its own auditing and coding programs when submitting hundreds of millions of dollars in claims to the Government Healthcare Programs. Currently, with the assistance of its primary information systems vendor, Cerner Corporation ("Cerner"), LifeBridge Health is able to bypass the default logic in its newly implemented revenue and accounting software, Cerner Millennium, to submit over $25 million per month in "SLAMMER" claims to the government for reimbursement. A SLAMMER Claim is internal LifeBridge Health terminology for a claim that is forced through the internal claims process to avoid any scrutiny from LifeBridge Health's coding review process.

4.      In addition, LifeBridge Health management is aware that many physicians that are billing the government have a history of bad claims, however, LifeBridge Health systematically allows these problem doctors' claims, and the claims of the physician assistants under their supervision, to be submitted to the government without any vetting by LifeBridge Health's audit department or its billing subsidiary, Practice Dynamics, Inc.

5.      Not only did Relator's supervisors condone and instruct LifeBridge Health's improper billing and auditing practices, they also ignored Relator's complaints. Tellingly, Relator, an Information Systems professional at LifeBridge Health, was directed to work with Cerner to develop coding for its payment systems for the SLAMMER Claims to bypass the necessary coding reviews.

### JURISDICTION AND VENUE

6.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b). This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district.

### THE PARTIES

**I.   Plaintiff-Relator**

8.      Relator Charles Morrison is an adult citizen and resident of the State of Maryland. Mr. Morrison has a B.S. degree in Management Information Systems from Ambassador University and a Master of Business Administration degree from the University of Texas at

3

Tyler. Mr. Morrison has 20-plus years of experience in healthcare applications implementation and leadership for best-of-breed and fully integrated electronic medical record-practice management enterprise-wide projects in revenue cycle transformation, system optimization post-installation, and initial system implementation. From March 2017 to the present, Relator has been employed as an IT Manager at LifeBridge Health in Baltimore, Maryland. His responsibilities as IT Manager include, among other things, responsibility for the overall design, implementation, testing, documentation, operation, and support of assigned Health Care Information Systems. Mr. Morrison is responsible for the management of the following applications: IS Revenue Cycle Patient Access and Patient Accounting for LifeBridge Physician Network – GE Centricity Business; IS Long-Term Care, Nursing Home Billing Application – HCS; IS Revenue Cycle for LifeBridge Sinai, Northwest Hospitals Patient Access – Cerner Millennium; and IS Revenue Cycle for LifeBridge Sinai, Northwest Hospitals Patient Accounting – Medipac. Mr. Morrison was previously employed at Cerner Corporation. Mr. Morrison has independent knowledge of all the allegations against Defendants and is the original source of the allegations contained in this Complaint. Before filing this Complaint, Mr. Morrison served the U.S. Attorney for the District of Maryland and the Attorney General for the State of Maryland with a disclosure of all material evidence and information in his possession as required by 31 U.S.C. § 3730(b)(2) and Md. Code Ann. Health Gen. § 2-604(a)(3)(i).

**II.   Defendants**

9.     Defendant LifeBridge Health, Inc. is a not-for-profit health care organization serving nearly 600,000 patients across Maryland. LifeBridge Health consists of Sinai Hospital of Baltimore, Northwest Hospital, Carroll Hospital, Levindale Hebrew Geriatric Center and Hospital, and its subsidiaries and affiliated units, including LifeBridge Health & Fitness and the LifeBridge Medical Care Centers in Eldersburg, Mays Chapel, and Reisterstown. Sinai Hospital,

4

Northwest Hospital, and Carroll Hospital are all acute-care general hospitals with complementary clinical centers.

10.     For its fiscal year ending June 2016, LifeBridge Health reported annual revenues of approximately $1.9 billion, of which 42% came from services provided under Medicare and 7% came from services provided under Medicaid. LifeBridge Health performs tens of thousands of technical procedures each year for which it receives payment through the Government Healthcare Programs.

11.     LifeBridge Health subsidiary Practice Dynamics, Inc. ("PDI") is a medical billing company that provides professional billing services for hundreds of physicians and non-physician practitioners rendering services at Sinai Hospital, Northwest Hospital, and Levindale Hebrew Geriatric Center & Hospital. PDI is a wholly-owned LifeBridge Health subsidiary medical billing company. In 2015, PDI processed more than $300 million in charges and $110 million in cash. Though LifeBridge Health is a non-profit entity, its subsidiary PDI is a for-profit entity. Jeff Watson, Chief Operating Officer of PDI, reports directly to Tony Morris, Senior Vice President of Finance for LifeBridge Health. Upon information and belief, PDI receives 10% of all of LifeBridge Health's billings as payment for its services.

12.     Defendant Sinai Hospital of Baltimore, Inc. is a subsidiary of LifeBridge Health. Sinai Hospital is Maryland's largest community hospital, with 467 beds. It is a teaching hospital for the Johns Hopkins University School of Medicine as well the University of Maryland School of Medicine.

13.     Defendant John Doe LifeBridge Physicians are hospital-based physicians who maintain their practices at LifeBridge Health facilities and whose claims are administered and

5

submitted by LifeBridge Health or its subsidiaries to the Government Healthcare Programs, and who have engaged in fraudulent claim submission practices as described herein.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    The Federal False Claims Act

14.    The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties that range between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id.*

### II.    The Maryland False Health Claims Act

15.    The Maryland False Health Claims Act provides that any person who knowingly makes or causes to be made any false statement or representation of a material fact for use in determining right to a payment from Maryland's state healthcare programs or health plans, including the Maryland Healthcare Programs, is liable for a civil penalty up to ten thousand dollars ($10,000) for each violation, plus three (3) times the amount of all payments judicially found to have been fraudulently received from state health plans or programs or its fiscal agents because of the act of that person. Md. Code Ann. Health-Gen. § 2-602. The MFHCA defines "knowingly" to mean that a person "[h]as actual knowledge of the information," or "[a]cts in

6

deliberate ignorance of the truth or falsity of the information," or "[a]cts in reckless disregard of the truth or falsity of the information." Md. Code Ann. Health-Gen. § 2-601(f).

## III. Healthcare Programs

### A. Medicare

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. Medicare is a federally funded and administered health care program for certain groups of persons, primarily the elderly and the disabled. It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

17.     Medicare now has four Parts, A through D. The two original components of Medicare are Part A, which covers inpatient hospital costs and related services, and Part B, which covers outpatient health care costs, such as physicians' fees. Part C, created by Congress in 1997, provides the same benefits to Medicare members as Parts A and B, but does so based on a managed care model, rather than the traditional fee-for-service model. Medicare Part D was created by the Medicare Prescription Drug, Improvement, and Modernization Act in 2003 and covers prescription drugs.

18.     The allegations in this complaint relate primarily to Medicare Part B, 42 U.S.C. §§ 1395j *et seq.* Part B is designed to create supplementary medical insurance for the aged by allowing beneficiaries to enroll voluntarily in the program and pay monthly premiums that are matched by federal contributions and which form a trust fund. Part B provides coverage in areas where Part A does not, but the types of services are the same. Medicare Part B pays for physicians' services, including diagnosis, therapy, surgery, consultations, and home, office, and institutional calls.

19.     Part B has an annual deductible, which was $183 in 2017. After the deductible is met, the Part B enrollee typically pays 20% of the Medicare-approved amount for most doctor services (including most doctor services while a hospital inpatient), outpatient therapy, and durable medical equipment.

20.     In 2017, approximately 1 million people were enrolled in Medicare in the State of Maryland, with total Medicare expenditures in the State of approximately $13.5 billion.

**B.  Medicaid**

21.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. The federal government provides a portion of each state's Medicaid funding. The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). In Maryland, the rate in effect for 2017 was 50%. Maryland's Medicaid program is referred to as the Maryland Medical Assistance Program ("MMAP").

22.     The Children's Health Insurance Program ("CHIP") provides health coverage to eligible children, through both Medicaid and separate CHIP programs. CHIP is administered by states, according to federal requirements. The program is funded jointly by states and the federal government. Maryland refers to its CHIP program at "MCHIP."

23.     In 2017, approximately 1.3 million Maryland residents were covered by MMAP/MCHIP.

8

## C. TRICARE/CHAMPUS

24.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

25.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

## D. Federal Employee Health Benefits Program

26.    The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901 *et seq.* Through the OPM, the government contracts with private health plans or "carriers" to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund") and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

9

## IV.    The 60-day Rule for Return of Overpayments

27.    Section 6402(a) of the Patient Protection and Affordable Care Act ("ACA") (P.L.

111-148) established new section 1128J of the Social Security Act, which requires providers and

suppliers who submit claims to Federal Healthcare Programs to report and return "identified"

overpayments to CMS within 60 days or face potential liability under the federal False Claims

Act. These requirements were implemented by CMS in a February 12, 2016, final rule (81 Fed.

Reg. 7653). The final rule set forth in 42 CFR § 401.305 - Requirements for reporting and

returning of overpayments - provides in relevant part:

(a) **General.**

(1) A person that has received an overpayment must report and return the
overpayment in the form and manner set forth in this section.

(2) A person has identified an overpayment when the person has, or should have
through the exercise of reasonable diligence, determined that the person has
received an overpayment and quantified the amount of the overpayment. A person
should have determined that the person received an overpayment and quantified
the amount of the overpayment if the person fails to exercise reasonable diligence
and the person in fact received an overpayment.

(b) **Deadline for reporting and returning overpayments.**

(1) A person who has received an overpayment must report and return the
overpayment by the later of either of the following:

(i) The date which is 60 days after the date on which the overpayment was
identified.

(ii) The date any corresponding cost report is due, if applicable.

\*        \*        \*

(e) **Enforcement.** Any overpayment retained by a person after the deadline for
reporting and returning the overpayment specified in paragraph (b) of this section
is an obligation for purposes of 31 U.S.C. 3729.

28.    Accordingly, under the 60-day Rule, providers are responsible for overpayments

that they know or should have known about through the exercise of reasonable diligence.

10

Providers that deliberately choose not to investigate when they are made aware of the existence of potential overpayments, are liable under the FCA. Reasonable diligence requires that providers (1) implement compliance activities to monitor for the receipt of overpayments; and (2) undertake investigations in a timely manner in response to obtaining credible information of a potential overpayment. CMS considers a timely investigation to be at the most six months from receipt of the credible information, except in extraordinary circumstances. The 60-day period begins to run when the provider has a chance to undertake follow-up activities and quantify the amount of the overpayment. The 60-day rule applies to overpayments identified within six years after they were received.

## V.    Medical Necessity Requirement

29.    Government Healthcare Program rules and regulations require that billed services be medically necessary. "[N]o payment may be made under part A or part B for any expenses incurred for items or services which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

30.    "A claim requesting payment for medically unnecessary services intentionally seeks reimbursement for a service that is not warranted by the patient's current and documented medical condition." 63 Fed. Reg. 8990.

31.    The diagnosis and procedures reported in a reimbursement claim must be based on documentation in the medical record.

## VI.    CMS & Maryland Billing Rules

32.    CMS is authorized by Congress to establish a uniform code for identifying physicians' services under Medicare Part B. *See* 42 U.S.C. § 1395w-4(c)(5).

11

33.    To effectuate a uniform code for identifying physicians' services, CMS utilizes a Healthcare Common Procedure Coding System ("HCPCS"). The HCPCS is divided into two principal subsystems, referred to as Level I and Level II.

34.    Level I is comprised of a numeric coding system established by the American Medical Association and entitled "Current Procedural Terminology" ("CPT") that is common language for coding physician services and procedures for purposes of seeking government funds through reimbursement from Government Healthcare Programs.

35.    Level II HCPCS, which is maintained and distributed by CMS in conjunction with private payer organizations as set forth in 42 C.F.R. § 414.40(a), is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment.

36.    HCPCS codes must be used by all "health plans," which include, *inter alia*, the Federal Healthcare Programs, as set forth in 45 C.F.R. § 160.103.

37.    Healthcare providers submit claims for reimbursement from Government Healthcare Programs on CMS 1500 or electronic 4010A1 claim forms.

38.    The claim forms include the appropriate codes, including CPT, HCPCS, HCPCS II, ICD-10-CM, as well as "modifiers" to describe the services rendered and billed.

39.    In order to bill the government through the Government Healthcare Programs, a health care provider must sign the CMS 1500 form, attesting to the fact that they "certify that the statements on the reverse apply to this bill and are made a part there of."

40.    The statements on the reverse of every CMS 1500 claim form include the following language regarding providing knowingly false information: "Any person who knowingly files a statement of claim containing any misrepresentation of any false, incomplete

12

or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

41.    The statements on the reverse of every CMS 1500 claim form include the following certification of medical necessity: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

42.    CMS publishes a *Medicare Claims Processing Manual* that sets forth instructions on how CPT codes are billed and the proper claims process for reimbursement from Medicare.

43.    Similarly, Maryland publishes a Maryland Medical Assistance Program Professional Services Provider Manual.

**A. Billing for Physician Services**

44.    Providers bill Government Healthcare Programs for the time they spend with a patient for evaluation and management ("E&M") service during an office visit. These E&M services vary with respect to, among other factors, the time a provider spends with the patient, as well as the complexity and severity of the health-related issues addressed by the provider.

45.    To bill Government Healthcare Programs for E&M services provided to a patient, providers must truthfully describe the healthcare service provided based on CPT code levels of service 1 through 5. The higher the CPT code level of service, the higher the reimbursement rate.

46.    Medical documentation of the services provided to the patient must justify the level of E&M service to justify billing at the corresponding CPT code to submit claims to the government.

13

47.     Billing of an E&M service related CPT code must be based on medical records verifying the patient history, examination, and medical decision making which was actually involved.

48.     The *2017 Maryland Medical Assistance Program Professional Services Provider Manual* details the medical record documentation necessary for proper payment under the Maryland Healthcare Programs:

> Providers must include the following in a participant's medical record, presented in a complete and legible manner:
>
> - Details of each participant encounter (including the date, the reason for the encounter, appropriate history and physical exam, review of lab, X-ray, and other ancillary services), assessment, and a plan for care (including discharge plan, if appropriate);
>
> - Past and present diagnoses;
>
> - Relevant health risk factors;
>
> - The participant's progress, including response to treatment, change in diagnosis, and participant non-compliance;
>
> - The written plan for care for on-going treatment, including medication (specifying frequency and dosage), referrals and consultations, participant/family education, and specific instructions for follow-up;
>
> - Documented support of the intensity of participant evaluation and/or treatment;
>
> - Authentication by date and signature from physician and/or non-physician health care professional; and
>
> - Any CPT/HCPCS procedure codes and ICD-9-CM (for dates of service before October 1, 2015) or ICD-10-CM codes (for dates of service on or after October 1, 2015) supported by the information in the medical record about the participant's condition.

14

**B. Outpatient Diagnoses Are to be Reported Based on Results of Diagnostic Testing**

49.     "The ICD Coding Guidelines for Outpatient Services (hospital-based and physician office) have instructed physicians to report diagnoses based on test results." *Medicare Claims Processing Manual*, Ch. 13 -- Radiology Services and Other Diagnostic Procedures.

50.     "Codes that describe symptoms and signs, as opposed to diagnoses, are acceptable for reporting purposes when a related definitive diagnosis has *not* been established (confirmed) by the provider." *ICD-10-CM Official Guidelines for Coding and Reporting FY 2018*, Section I. Conventions, General Coding Guidelines and Chapter Specific Guidelines, B. General Coding Guidelines, at 14 (emphasis added).

51.     The ICD-10-CM Official Guidelines for Coding and Reporting provides that outpatient "patients receiving diagnostic services only" should be coded as follows:

> For patients receiving diagnostic services only during an encounter/visit, sequence first the diagnosis, condition, problem, or other reason for encounter/visit shown in the medical record to be chiefly responsible for the outpatient services provided during the encounter/visit. Codes for other diagnoses (e.g., chronic conditions) may be sequenced as additional diagnosis. For encounters for routine laboratory/radiology testing in the absence of any signs, symptoms, or associated diagnosis, assign Z01.89, Encounter for other specified special examinations. If routine testing is performed during the same encounter as a test to evaluate a sign, symptom, or diagnosis, it is appropriate to assign both the Z code and the code describing the reason for the non-routine test.
>
> ***For outpatient encounters for diagnostic tests that have been interpreted by a physician, and the final report is available at the time of coding, code any confirmed or definitive diagnosis(es) documented in the interpretation. Do not code related signs and symptoms as additional diagnoses.***
>
> Please note: This differs from the coding practice in the hospital inpatient setting regarding abnormal findings on test results.

*ICD-10-CM Official Guidelines for Coding and Reporting FY 2018*, Section IV. Diagnostic Coding and Reporting Guidelines for Outpatient Services, at 110-111 (emphasis added).

52.     ICD-10 Coding Guidelines provide guidance regarding how to code outpatient

visits when a definitive diagnosis has not been established:

> If a definitive diagnosis has not been established by the end of the encounter, it is
> appropriate to report codes for sign(s) and/or symptom(s) in lieu of a definitive
> diagnosis. When sufficient clinical information isn't known or available about a
> particular health condition to assign a more specific code, it is acceptable to report
> the appropriate "unspecified" code (e.g., a diagnosis of pneumonia has been
> determined, but not the specific type). Unspecified codes should be reported when
> they are the codes that most accurately reflect what is known about the patient's
> condition at the time of that particular encounter. ***It would be inappropriate to
> select a specific code that is not supported by the medical record documentation
> or conduct medically unnecessary diagnostic testing in order to determine a
> more specific code.***

*ICD-10-CM Official Guidelines for Coding and Reporting FY 2018*, Section I. Conventions,

General Coding Guidelines and Chapter Specific Guidelines, B. General Coding Guidelines, 18.

Use of Sign/Symptom/Unspecified Codes, at 18 (emphasis added).

**VII.     HHS OIG Compliance Program Guidance**

53.     The Office of the Inspector General ("OIG") of the HHS has created compliance

program guidance for certain providers, including hospitals and third-party billers.

**A.  Compliance Guidance for Hospitals**

54.     OIG issued its initial Compliance Program Guidance for Hospitals in 1998. *See*

63 Fed. Reg. 8987. OIG issued its Supplemental Compliance Program Guidance for Hospitals in

2005. *See* 70 Fed. Reg. 4858. A compliance program assists a hospital with fulfilling its legal

duty to ensure that it is not submitting false or inaccurate claims to government and private

payors.

55.     The elements of a hospital compliance program include: (1) development and

distribution of written standards of conduct and written policies and procedures; (2) designation

of a chief compliance officer and other appropriate bodies, who report directly to the CEO; (3)

development and implementation of regular, effective education and training programs; (4)

16

maintenance of a process to receive complaints and protect whistleblowers from retaliation; (5) development of a system to respond to allegations of improper/illegal activities and appropriate disciplinary action; (6) use of audits and/or other evaluation techniques to monitor compliance and assist in reduction of identified problem areas; and (7) investigation and remediation of identified systemic problems and the development of policies addressing the non-employment or retention of sanctioned individuals. 63 Fed. Reg. 8989.

56.     Services should be documented prior to billing to ensure that only accurate and properly documented services are billed. 63 Fed. Reg. 8991.

57.     The OIG identifies special areas of concern in its guidance, including providing medically unnecessary services, upcoding, duplicate billing, and unbundling. 63 Fed. Reg. 8990.

58.     A hospital's compliance program should provide that claims should only be submitted for services that the hospital has reason to believe are medically necessary and maintain documentation to support medical necessity. 63 Fed. Reg. 8992.

59.     Upcoding is "the practice of using a billing code that provides a higher payment rate than the billing code that actually reflects the service furnished to the patient." 63 Fed. Reg. 8990 n.15.

60.     "Although duplicate billing can occur due to simple error, systematic or repeated double billing may be viewed as a false claim, particularly if any overpayment is not promptly refunded." 63 Fed. Reg. 8990.

61.     Unbundling "is the practice of submitting bills piecemeal or in fragmented fashion to maximize the reimbursement for various tests or procedures that are required to be billed together and therefore at a reduced cost." 63 Fed. Reg. 8990 n.20.

62.     "CMS developed the National Correct Coding Initiative ("NCCI") to promote correct coding methodologies. ... If the hospital uses code pairs that are listed in the NCCI and those codes are not detected by the editing routines in the hospital's billing system, the hospital may submit duplicate or unbundled claims. Intentional manipulation of code assignments to maximize payments and avoid NCCI edits constitutes fraud. Unintentional misapplication of NCCI coding and billing guidelines may also give rise to overpayments or civil liability for hospitals that have developed a pattern of inappropriate billing. To minimize risk, hospitals should ensure their coding software includes up-to-date NCCI edit files." 70 Fed. Reg. 4860-4861.

63.     The OIG guidance to hospitals further advises that "proper education and training of corporate officers, managers, employees, physicians and health care professionals, and the continual retraining of current personnel at all levels, are significant elements of an effective compliance program." 63 Fed. Reg. 8994.

64.     In 1997, Congress enacted the Outpatient Prospective Payment System ("OPPS"), which became effective August 1, 2001. The implementation of OPPS "increased the importance of accurate procedure coding for hospital outpatient services." 70 Fed. Reg. 4860. It also "increased the need for hospitals to pay particular attention to their computerized billing, coding, and information systems." 70 Fed. Reg. 4882. "Prudent hospitals will take steps to ensure that they thoroughly assess all new computer systems and software that impact coding, billing, or the generation or transmission of information related to Federal health care programs to their beneficiaries." *Id.*

**B. Compliance Guidance for Third-Party Billers**

65.     The OIG issued its Compliance Program Guidance for Third-Party Medical Billing Companies in 1998. *See* 63 Fed. Reg. 70138. Third-party billers have a legal duty to

ensure that they are not submitting false or inaccurate claims to government payors. 63 Fed. Reg. 70140.

66.    Third-party billers who do not code bills "should implement policies that require notification to the provider who is coding to implement and follow compliance safeguards with respect to documentation of services rendered." 63 Fed. Reg. 70143.

### DEFENDANTS' FRAUDULENT CLAIMS SUBMISSIONS

67.    Until July 1, 2018, LifeBridge Health had been using Medipac for its patient accounting for the last 28 years. Medipac is an aging product from McKesson Corporation, first developed in the 1970s. LifeBridge Health had been using Medipac for, among other things, physician orders and diagnoses, and ultimately used it to submit claims to Government Healthcare Programs.

68.    In or about 2015, LifeBridge Health decided to upgrade its revenue systems and convert to Cerner Millennium. The conversion to Cerner Millennium started in August 2016. Since starting his employment in March 2017, Relator has been overseeing the conversion from Medipac to Cerner Millennium, which became operational for LifeBridge Health Sinai Hospital as of July 1, 2018, and is expected to be operational for LifeBridge Health Carroll Hospital on November 4, 2018.

69.    During the course of the conversion, Relator has identified two significant practices that LifeBridge Health has been engaging in for many years that have caused the government to reimburse LifeBridge Health hundreds of millions of dollars for improper claims.

### I.    "SLAMMER CLAIMS"

70.    In connection with the conversion from Medipac to Cerner Millennium, Relator discovered a billing issue that results in LifeBridge Health submitting fraudulent claims to the

government for technical services ordered by hospital-based LifeBridge Health physicians and provided to patients by hospital-based LifeBridge Health facilities.

71.    In the Medipac system, when a physician sees a patient for an office visit, the physician may order a technical procedure for the patient. An example of a technical procedure is a lab test or MRI. These technical procedures are performed at hospital-based LifeBridge Health facilities, and claims are submitted to Government Healthcare Programs as separate outpatient encounters.

72.    · LifeBridge Health facilities perform several thousand technical procedures a month, accounting for approximately $40-50 million per month in claims. Upon information and belief, Government Healthcare Program claims account for 50-75% of the technical claims.·

**A.    LifeBridge Health Improperly Submits Diagnosis Codes that are Not Supported by Diagnostic Testing**

73.    LifeBridge Health fails to follow CMS billing rules for its technical claims. The diagnosis codes on technical claims submitted by LifeBridge Health to Government Healthcare Programs are based on a physician's initial order, not based on the result from the technical procedure. The consequence of billing on an initial order is that a claim uses a diagnosis code that is not supported by the patient's medical record, including the ordered tests.

74.    Accordingly, the logic in the new Cerner Millennium system needed to be modified by Cerner, as Cerner Millennium has certain default processes that would not have allowed LifeBridge Health to submit claims based on an initial diagnosis rather than the result. · This bypass logic in Cerner Millennium was termed the "SLAMMER LOGIC."

75.    The Cerner default process required that the type of diagnosis assigned to each technical order be identified as whether it was for Admitting, Working, Principle, or Final. A diagnosis should only become Final after the result is determined from the technical procedure.

Only if a diagnosis is Final would it be able to be submitted with a claim. However, the SLAMMER LOGIC allows the Working diagnosis in a patient's chart to be billed. The SLAMMER LOGIC automatically changes an initial non-final diagnosis to a final diagnosis without having even been reviewed by a physician and regardless of the result of the technical procedure. Accordingly, this flawed logic will allow LifeBridge Health to continue submission of claims based on initial diagnoses rather than on the final diagnosis.

76.     In or about April 2018, "C.H.", the IS Director for LifeBridge Health who is overseeing the Cerner Millennium implementation, expressly discussed with several Cerner representatives that LifeBridge Health required Cerner to implement the SLAMMER LOGIC into Cerner Millennium. In those discussions, LifeBridge Health expressly directed Cerner to program Cerner Millennium so that it takes diagnoses from the registration process and marks them as "final diagnosis."

77.     Aside from the fact that the diagnosis code that is being used for claims is not based on the result (not Final), using the Admitting, Working, or Principle diagnosis code raises other concerns. The automated Final diagnosis code is tied to other patient IS applications, including patient medical records. For example, if there is an initial diagnosis submitted with a technical order but the resulting diagnosis is something different, then, based on the SLAMMER LOGIC, that initial diagnosis, despite its inaccuracy, will become part of a patient's medical record as a final diagnosis. If a different doctor sees the patient in the future, reviews the patient's medical records, and sees that incorrect diagnosis in the medical history, that could have disastrous consequences for the patient's treatment.

**B. LifeBridge Health Management Decided to Bypass Review of Technical Claims and Suppressed the Medical Necessity Checker in the New Cerner Millennium**

78.     Significantly, the technical claims do not undergo any review by LifeBridge

Health's Health Information Management ("HIM") coders or physician offices prior to

submission to the government. An HIM Coder is trained in assigning the proper procedures and

diagnostic codes to patients' records using different forms of coding libraries. By bypassing an

HIM coding review, LifeBridge Health is able to submit claims for duplicate tests, medically

unnecessary procedures, and claims where the diagnosis and/or procedure codes do not support

the tests. LifeBridge Health has termed these unreviewed technical claims "SLAMMER Claims"

because they are slammed through the claims process without any vetting by HIM coders for

accuracy, compliance with CMS guidelines, or duplication.

79.     Each month, LifeBridge Health creates a "SLAMMER REPORT" for all the

SLAMMER Claims. For example, the SLAMMER Report for January 2018 shows

approximately $45 million in SLAMMER Claims covering approximately 3,700 technical

procedures. All of these claims were "slammed" through without any vetting by HIM coders for

accuracy, compliance with CMS guidelines, or duplication.

80.     "J.M.," Director of the Centralized Billing Office at LifeBridge Health, raised the

issue of whether the technical claims should be reviewed by an HIM coder prior to submission to

the government. "R.M.," Director of Health Information Management at LifeBridge Health,

stated that for LifeBridge Health to be compliant, it would need five full-time HIM coders at an

annual salary of $80,000 each, for a total of $400,000 per year. However, LifeBridge Health

management decided that was too much money and that it would continue its practice to bypass

any coding review for technical claims.

22

81.     Relator's supervisor, "C.H.," Director of IS, told Relator that LifeBridge Health is able to push through the SLAMMER Claims without HIM coding review because it relies on the physician office to make sure the diagnosis codes submitted with claims are correct. However, as described below, LifeBridge Health management knows or recklessly disregards that LifeBridge Health physicians and staff receive little to no training on proper coding and that many physicians have been flagged as problematic billers.

82.     Hospitals' revenue applications that are used for claim submission typically should have a "medical necessity checker" that would flag potentially problematic claims. Medipac does not and never had a medical necessity checker.

83.     Cerner Millennium has a medical necessity checker built into its programming. However, LifeBridge Health management requested that Cerner suppress the bill hold logic to have the technical claims bypass the medical necessity checker, and Cerner willingly did so.

## II.     PHYSICIAN CLAIMS

### A. LifeBridge Health Physicians and Staff Receive Little to No Training in Proper Coding, and LifeBridge Health Management Failed to Follow the Compliance Department's Proposal for Audit Reviews of New Hires Prior to Coding Training

84.     At LifeBridge Health, it is the primary responsibility of physicians and their staff to properly code claims for submission to Government Healthcare Programs. However, physicians and their office staff working at LifeBridge Health receive little, if any, education from LifeBridge Health regarding how to properly code claims. When new physicians (interns, residents, PAs) arrive at LifeBridge Health, they do not receive any coding education from LifeBridge Health. The new physicians therefore learn their coding practices from the physicians for whom they work, who themselves have had little or no coding education.

85.     Because of the widespread coding problems, LifeBridge Health's Compliance Department proposed earlier this year that all new hires should undergo an audit review and be

23

put into the LifeBridge Health Transaction Editing System ("TES") until they received coding

education. Doctors in TES do not get their reimbursements by year-end unless the claims are

manually approved. However, this proposal was never put in effect. Instead, LifeBridge Health

management decided that the audit review for new hires would be done quarterly, not when they

are hired. To date, even though LifeBridge Health has dozens of new hires this year, only 13 new

providers are being put into TES for coding review.

**B. LifeBridge Health Compliance Department Flagged Doctors with Problem Coding, But Management Overrode Reviews of Those Doctors' Claims and Directed That They be Submitted for Payment**

86.     Physician office coding problems are well-known at LifeBridge Health. In late

2017/early 2018, LifeBridge Health's Office of Provider Compliance developed an Audit Score

Methodology. The scoring methodology assigns points based on the findings of a documentation

review. For example, a provider may receive a score of 6 if there is insufficient documentation

for the procedure billed, a score of 3 for bundling/unbundling of E&M services, a score of 2 if

E&M services are "overcoded" by one level or 4 if "overcoded" by two or more levels, and a

score of 0.5 if a provider documents a diagnosis different than the diagnosis selected. The lower

the score the better. A higher score may indicate that immediate improvement is needed and a

meeting will be held with the provider to review the audit results in detail, provide instruction,

and answer questions.

87.     The Audit Score Methodology identified 173 physicians out of 600 total

physicians who scored high enough for LifeBridge Health to consider the physicians to be

problem billers. Initially, it was suggested that these 173 problem doctors should be subject to an

internal coding audit. An internal coding audit would mean that the doctors would have their

reimbursement payments delayed.

88.     In order to avoid delays, LifeBridge Health management decided to only audit the top eight problem doctors and ignore the remaining 165 problem doctors. As part of the coding audit process, problem doctors' claims are put into the Transaction Editing System. Doctors in TES do not get their reimbursements by year-end unless the claims are manually approved. The eight doctors placed in TES in April 2018 were: W.H., J.M., C.R., H.F., O.B., A.F., O.Z., S.M.

89.     However, five of the eight doctors in TES had their charges "drop," meaning that their claims were not reviewed but taken out of TES and processed for reimbursement without any audit review. Their claims dropped because the dollar value of the claims was getting too high and management decided not to pursue the audit.

90.     Of the remaining three doctors (H.F., W.H. and C.R.), over $300,000 worth of claims were at issue for the month of April 2018 and over $500,000 for the month of May 2018.

91.     The "review" of the flagged claims, however, is not a review by HIM coders. For the claims to be cleared in TES, the claims must simply be reviewed and edited by the physician that created the claim. The physician office must review the claims to determine whether they are duplicates, medically necessary, or the correct diagnosis or procedure code.

92.     A front office staff member, someone with no coding experience, merely checks off each claim for approval. If a diagnosis or procedure code is needed, the office staff may use an old, incorrect diagnosis or procedure code from the patient's medical chart.

93.     In the case of C.R., one of the three doctors who remained on TES, at one point there were $83,000 in withheld claims. However, after C.R.'s office "edited" the claims, $76,000 in claims were released.

94.     Once the claims are coded by the physician offices, they are then sent to PDI for processing and submission to the respective government program or private insurer. PDI only

wants to receive "clean claims," meaning that it will not review claims submitted by LifeBridge Health physicians for inaccuracies, duplication, or any other impropriety. While PDI employs medical billing coders, it only uses coders if a specific physician office requests a coding review of their claims, which will be an additional expense for the physician. Upon information and belief, very few physician offices use PDI coders because they do not want to incur the additional expense of a PDI coder.

95.    LifeBridge Health, including PDI, was aware of problematic billing by physicians, yet submitted those physicians' claims to Government Healthcare Programs without review.

### FALSE CLAIMS FOR PAYMENTS FROM GOVERNMENT HEALTHCARE PROGRAMS

96.    In order to be eligible for reimbursement from Government Healthcare Programs, Defendants must expressly certify their compliance with application federal laws and regulations, CMS instructions, and state law.

97.    For this reason, each claim for reimbursement that Defendants submitted or caused to be submitted to Government Healthcare Programs is premised, either directly or indirectly, upon Defendants' compliance with applicable federal laws and regulations, CMS instructions, and state law.

98.    Providers and hospitals violate the FCA by submitting, or by causing submission of, a claim to Government Healthcare Programs seeking reimbursement for claims with improper diagnosis and/or procedure codes, duplicates, not medically necessary, and had not been reviewed by a HIM coder.

99.     Defendants knew that they could only submit claims for payment for services that were actually provided, that were reasonable, medically necessary, and properly documented in their medical charts.

100.    Defendants knew they were responsible for understanding, implementing, and educating themselves on all coding and billing requirements of the Government Healthcare Programs

101.    Defendants, by submitting and/or causing to be submitted to the government claims for reimbursement, falsely certified their compliance with applicable law.

102.    In addition, during the relevant time period, Defendants did not employ certified coders and did not adequately train and educate its billing personnel. Defendants did not provide specific HCPCS coding and billing training to its employees.

103.    Upon information and belief, Defendants did not have any policies or procedures in place for its physicians or billing personnel to receive updates, alerts, clarifications, or changes to Government Healthcare Program billing guidelines.

104.    During the relevant time period, Defendants implemented a billing policy and practice of prioritizing claim payment over claim accuracy. Defendants' goal of maximizing claim payment resulted in the submission of claims that did not represent the actual services provided to the patient, did not represent reasonable and/or medically necessary services, and did not follow program and billing guidelines.

105.    Defendants have been and continue to be reckless in failing to provide billing personnel with adequate training and educational resources, including access to critical updates, guidelines, and regulations.

106.   Defendants' reckless and deliberately ignorant conduct enabled, caused, and actually implemented the submission of thousands of false claims to Government Healthcare Programs.

107.   Defendants' fraud is material because, if the United States and the State of Maryland were aware of Defendants' practices of billing unaudited claims that were intentionally allowed to bypass internal self-auditing protocols, the government would not have authorized or issued reimbursement.

108.   In addition, by billing the government for unaudited and unverified procedures, Defendants made and used false statements that were material to the government's decision to issue payment on claims associated with such medications.

109.   Defendants did not take adequate steps to ensure compliance with Government Healthcare Program instructions and requirements including compliance with the FCA.

110.   Defendants deliberately ignored or recklessly disregarded basic requirements for FCA compliance, despite being aware of, and certifying that they would comply with, these laws and regulations.

111.   Defendants implemented an auditing program that identified 173 problem billers based on Defendants' affirmative duty to ensure that only reasonable and medically necessary, nonduplicative, and properly coded claims are billed to Government Healthcare Programs. The auditing program required internal audits of physicians and withholding of claim submission to Government Healthcare Programs.

112.   However, LifeBridge Health violated its own written auditing compliance program, failed to monitor or ensure compliance with the FCA, or other program rules and regulations in any meaningful way, and ignored specific warnings that its billing procedures and claim

28

submissions were improper, and that its physician employees were fraudulently billing for unreasonable and medically unnecessary services, and for services that were duplicative and/or not properly documented.

113. Defendants refused to take appropriate steps to audit all 173 problem physicians and investigate the problems or repay any claims to Government Healthcare Programs.

## CLAIMS FOR RELIEF

### COUNT I
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(A)(1)(A) (2009)
### (PRESENTING OR CAUSING PRESENTMENT OF A FALSE CLAIM)

114. Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

115. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a). Defendants systemically filed claims for reimbursement from the Federal Healthcare Programs that had improper diagnosis and/or procedure codes, were duplicate claims, were not medically necessary, and had not been reviewed by a HIM coder.

116. The Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved presented or caused to be presented, false or fraudulent claims in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1)(a). From the highest management levels on down the Defendants' corporate ladders, Defendants directed their medical billers to submit claims to the Federal Healthcare Programs that Defendants knew were problematic, including claims with improper diagnosis and/or procedure codes, duplicate claims, claims that were not medically necessary, and claims that had not been reviewed by a HIM coder.

117.   By virtue of the false claims presented or caused to be presented by Defendants,

the United States suffered damages and therefore is entitled to treble damages under the False

Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

**COUNT II**
**FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(A)(1)(B)**
**(KNOWINGLY PRESENTING A FALSE OR FRAUDULENT RECORD)**

118.   Plaintiff-Relator realleges and incorporates by reference the allegations contained

in the foregoing paragraphs of this Complaint.

119.   By virtue of the acts described above, Defendant knowingly made, used, or

caused to be made or used false records and statements, to get the false or fraudulent claims paid

or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(b), presented or caused to

be presented, false or fraudulent claims to the United States Government for payment or

approval in violation of 31 U.S.C. § 3729(a)(1)(b).

120.   The Defendants, in reckless disregard or deliberate ignorance of the truth or

falsity of the information involved, made, used, caused to be made, or caused to be used, false or

fraudulent records and statements to get false or fraudulent claims paid or approved, in violation

of, *inter alia*, 31 U.S.C. § 3729(a)(2) (and as amended 31 U.S.C. §3729(a)(1)(B)). From the

highest management levels on down the Defendants' corporate ladders, the Defendants directed

its medical billers to submit claims to the Federal Healthcare Programs that Defendants knew

were problematic, including with improper diagnosis and/or procedure codes, were duplicates,

were not medically necessary, and had not been reviewed by a HIM coder.

121.   By virtue of the false records or false statements caused to be made by

Defendants, the United States suffered damages and therefore is entitled to treble damages under

30

the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

### COUNT III
### FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(G)
### (FALSE RECORD TO AVOID AN OBLIGATION TO REFUND)

122.    Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

123.    Defendants knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

124.    By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

### COUNT IV
### MARYLAND FALSE HEALTH CLAIMS ACT
### MD. CODE ANN. HEALTH-GEN. § 2-601 *ET SEQ.*

125.    Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

126.    By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or misrepresentation for use in determining rights to a benefit or payment under the Maryland Healthcare Programs. Md. Code Ann. Health-Gen. § 2-601 *et seq.*

127.   By virtue of the false statements or misrepresentations caused to be made by Defendants, the State of Maryland suffered damages and therefore is entitled to treble damages, as determined at trial, plus civil penalties of $10,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator on behalf of the United States of America demands that judgment be entered in its favor and against the Defendants as follows:

A. On Count I (Presenting or Causing Presentment of False Claims), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

B. On Count II (Knowingly Presenting a False or Fraudulent Record), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

C. On Count III (False Record to Avoid an Obligation to Refund), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial.

WHEREFORE, Plaintiff-Relator on behalf of the State of Maryland demands that judgment be entered in its favor and against the Defendants as follows:

D. On Count IV (Knowingly Making a False Statement in Connection with Determining Right to Payment), judgment against the Defendants for treble damages as further established at trial plus a penalty of $10,000 per false claim as established at trial.

## PRAYER FOR A JURY TRIAL

The United States of America, State of Maryland, and Relator pray a jury trial in this action.

Respectfully submitted,

Andrew D. Freeman (Bar No. 03867)
Neel K. Lalchandani (Bar No. 20291)
BROWN GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030
adf@browngold.com
nlalchandani@browngold.com
*Local Counsel for Plaintiff-Relator*
*Charles B. Morrison*

Arvind Khurana
*Pro Hac Vice* Application Forthcoming
KHURANA LAW FIRM, P.C.
330 East 18th Street
Brooklyn, New York 11226
Tel: (212) 847-0145
akhurana@khuranapc.com

Kristi Stahnke McGregor
*Pro Hac Vice* Application Forthcoming
James E. Evangelista
*Pro Hac Vice* Application Forthcoming
David Worley
*Pro Hac Vice* Application Forthcoming
EVANGELISTA WORLEY LLC
8100 A Roswell Rd., Suite 100
Atlanta, Georgia 30350
Tel: (404) 205-8400
kristi@ewlawllc.com
jim@ewlawllc.com
david@ewlawllc.com

*Counsel for Plaintiff-Relator*
*Charles B. Morrison*

33

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, a true and correct copy of the foregoing was served via hand delivery on Robert K. Hur, United States Attorney for the District of Maryland, 36 S. Charles Street 4th Fl., Baltimore, MD 21201.

I further certify that on July 27, 2018, a true and correct copy of the foregoing was served via certified mail in accordance with Fed. R. Civ. P. 4(i)(1) on the Hon. Jefferson Sessions, Attorney General of the United States, at the Department of Justice, 950 Pennsylvania Avenue, N.W., Room B 103, Washington, D.C. 20530-0001.

I further certify that on July 27, 2018, a true and correct copy of the foregoing was served via hand delivery in accordance with Md. Rule 2-124(k) on the Hon. Brian E. Frosh, Attorney General of Maryland, at the Office of the Attorney General, 200 St. Paul Place, Baltimore, MD 21202.

Andrew D. Freeman
Counsel for the Relator

34